| | |
|---|---|
| United States District Court<br>Eastern District of New York | 1:18-cv-04982 |
| Cassandra Song individually and on behalf of all others similarly situated<br><br>       Plaintiff<br><br>   - against -<br><br>Kind LLC, Kind INC.<br><br>       Defendant | Complaint |

   Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

   1.  Kind LLC ("defendant") manufactures, distributes, markets, labels and sells fruit products in the form of bars (35 grams) and pieces (18 grams) (the "Products").

   2.  The Products are available in combinations of various fruit ingredients with a naming convention based on same, i.e., the bar containing "mango, apple, chia" is referred to as the "mango apple bar."

| Bars | Pieces |
|---|---|
| Mango Apple | Cherry Apple |
| Strawberry Apple | Cherry Strawberry Apple |
| Pineapple Coconut | Mango Apple |
| Cherry Apple | |
| Apricot Pear | |
| Pineapple Banana | |

   3.  The Products falsely convey they are manufactured from start to finish and directly from whole fruit ingredients because they all use collective names to refer to their components.

1

Table 2



Cherry Apple Bar

Cherry Apple Pieces



(pieces product)

4. The below images are examples of a bar and pieces product label.

Table 1



5. The Products' representations emphasize their equivalence to whole fruits:

| Table 2 |
|---|
|  |

6. In other words, the message is that the Products are made by taking whole intact fruits, washing, dicing or chopping, expressing juice, etc., then shaping to form the final product.

7. It is misleading to list ingredients with a collective name because consumers are unable to distinguish the value, quality and nature of the actual ingredients prior to purchase.

8. For example, tomatoes are used in food in numerous forms – tomato paste, tomato puree, tomato jam, tomato sauce, tomato powder, diced tomatoes, etc.

9. The ingredient list on a bottle of tomato sauce declares "Tomato Puree (Water, Tomato Paste), Diced Tomatoes," as opposed to the solitary word "tomatoes."

10. This is because tomato puree is a different product from tomato sauce and there are differences in the functional, sensory, textural, organoleptic, nutrient and other properties between the specific forms of an ingredient (i.e., tomato paste) and the collective name ("tomato").

11. If the ingredient list declared only "Tomatoes," consumers would reasonably understand such a product to be less processed, fresher, healthier and would pay more for and water is added.

12. An example of a product which uses a collective name as an ingredient in a non-misleading manner is store-bought refrigerated or frozen mashed potatoes.

13. This is because the potatoes are brought to a manufacturer, where they are sorted, washed, steamed, chopped and mashed, in one processing line under one roof.

14. The use of generic, collective names for the ingredients is relevant and material as consumers increasingly seek products made from whole, unprocessed ingredients as opposed to by-products or processed derivative ingredients.

15. This gives a reasonable consumer the following impression and message:

- the raw material ingredients are, whole apples, whole mangoes, etc., at the point directly prior to their transformation into the Products
- the ingredients are not processed into non-whole form product derivatives and then recombined to form the products
- the ingredients are fresher and healthier because, i.e., whole apples and whole mangoes cannot be preserved for several years without significant losses in quality or preservatives

16. The Products' listing of ingredients through collective name of the fruits is deceptive, unlawful and misleading to reasonable consumers.

17. Federal regulations, mirrored by those of this and other states, require that the name ascribed to an ingredient be a specific name as opposed to a collective name (subject to certain non-applicable exceptions).

18. This is because many of the ingredients especially the tropical fruits, are imported.

19. This is confirmed by the Products' labels, which contain the following statement on the back label.

4

> Made in U.S.A. with domestic and imported ingredients

20. The United States does not produce or process tropical fruits other than small amounts of mango (Florida) and pineapple (Hawaii).

21. Further, the tropical fruit grown in the US is consumed in its fresh form.

22. Fruit processing typically occurs near where the fruits are harvested, due to regional familiarity with the crop and expertise, minimal deterioration between harvest and processing since there is no global shipping involved, and because it is not cost-effective to import fresh tropical fruit and process it in the importing country.

23. There also would be no way to utilize the many byproducts of tropical fruits, which are necessary for profitable operation.

24. Based on the above, it is likely the tropical fruit ingredients contained in the Products are imported into the United States in dried form since this is an efficient way for transportation and prevents deterioration in quality.

25. Reasonable consumers are aware that fruits contain naturally occurring sugars and are valuable sources of other nutrients and vitamins.

A. Tropical Fruit Ingredients

26. Drying is a process to remove moisture content to a level at which deterioration from chemical reaction and microorganism are minimized.

27. Conventional drying techniques applied in the preservation of fruits and vegetables cause losses in nutritional value, color, flavor, aroma and texture.

28. Many people think of fruit drying as occurring under the sun.

29. However, sun, or air-drying, induces changes referred to as a 'collapse phenomenon' when the solid matrix of the food stuff can no longer support its own weight, leading to a decrease in volume, increase in stickiness and caking of dry powders, loss of porosity and change in colors.

30. To avoid this problem, pre-treatment with sugar solution is used to mitigate the harsh effects that will be caused by the loss of water and nutrients in the drying process.

31. Osmotic dehydration, also called a "dewatering impregnation soaking process" (DISP), is a water removal process that involves the soaking of fruits in hypertonic sugar solution or often, juice concentrate, to reduce the water content while increasing the soluble solid content.

32. Water moves through the selective permeable membrane with much greater ease than in the dissolved substances with the complex cellular structure of the food acting as a selectively permeable membrane.

33. Two major simultaneous counter-current flows occur during osmotic dehydration: water flow out of the food into the solution and a simultaneous transfer of solute from the solution into the food.

34. Since sugar does not react with amino acids or proteins to cause the Maillard reaction, browning and loss of nutrition in products can be eliminated.

35. Using osmotic pretreatment prior to air drying can be practical only when the osmotic agent that is gained by the food is required for the product.

36. In tropical fruits, sugar is a required component, and the result of osmotic dehydration on tropical fruits is not just the concentration of the naturally present sugar – but also, the *addition* of sugars because of the solute uptake during the osmotic process.

37. Various types of sugars are used for osmotic dehydration such as sucrose, glucose, maltose, maltitol, sorbitol and trehalose.

6

38. The result is an increased net sugar content in the fruit which is sweeter than had it been only air dried, or if it were consumed fresh.

39. Solute uptake and leaching of valuable product constituents out of the fruit leads to substantial modification of its original composition.

40. Pineapple is an ingredient in multiple products included herein.

41. Dried pineapple is prepared by osmotic dehydration, by being infused in a sugar syrup followed by convective drying.

42. This is distinct from the "candied pineapple" we are familiar with that is coated with sugars.

43. This addition of sugar to fruits in this manner was recognized by customs authorities who classified them as more than simply a dried fruit but short of being preserved by sugar.

II. Mango Apple Bar – Vitamin C

44. The mango apple bar representations are misleading because they claim the product "only" contains mango, apple and chia.

Table 5



45. Notwithstanding the above-described added sugars introduced during osmotic drying to the mango component, the product also contains ascorbic acid, omitted from the ingredient list.

7

46. This is evident based on the nutrition facts indicating vitamin C content of 25%. which indicates 22.5 mg of vitamin C.



Table 3

Ingredients: Mango, apple, chia seeds.

47. Among the three listed ingredients, mango has over ten times as much Vitamin C as apple and chia seeds.

48. According to the USDA nutrition database, 100 grams of mango (raw) contains 36.4 mg of vitamin C.

49. The mango apple bar is only 35 grams, so if all 35 grams were raw mango, it would contain 12.7 mg of vitamin C, or the equivalent of 14 % of the daily value of 90 mg.

50. However, the bar is not entirely made up of mango nor is the product a fresh mango, and even if it was, it would not be capable of providing 25% vitamin c.

51. The only way to have the mango apple bar contain 25% vitamin C is through additional ingredients.

52. Vitamin c is water-soluble and most labile component among all the vitamins contained in foods and is related to water content, reduced by heat treatment.

53. Thus, after mechanical operations, the decrease of water content and the oxidation reactions in fresh-cut mango experience significant losses of vitamin C.

54. Though mango pieces can be and are air dried, they are more often subjected to pretreatments (osmotic dehydration) which involve infusion with various ingredients.

55. Here, one of those ingredients in the solution was ascorbic acid

56. The infusion of ascorbic acid preservative prevents oxidation, controls color and *significantly increases* the vitamin C content in mango cubes, according to various authoritative studies.

57. Several of the Products contain cherries, such as the cherry apple bar, strawberry apple bar, cherry apple bites and strawberry cherry apple bites ("cherry products").

58. All the cherry products contain added sugars because tart or sour cherries are utilized which have sugar added to them in the drying process.

59. For explanatory purposes, the cherry apple pieces product will be examined, though the conclusions reached here apply to all the cherry products.

60. This is because it would be impractical for a company to produce multiple cherry products and switch between cherry cultivars.



Table 4
Apple, Cherry – Cherry Apple Bites

61. While sweet cherries could theoretically have supplied the sugar content to the cherry products, these are not used for various reasons.

62. First, defendants describe the cherries as "tart cherries" on its website.

Table 6

**product description**

Tart cherries meet sweet apple in these bite-size snacks. Made with only two ingredients and no juices, purees, concentrates, preservatives or added sugar, they're the perfect fruit snack for any lunchbox. Plus, with a full serving of fruit in each pouch, this is a snack both parents and kids are sure to love.

63. Sweet cherries are mostly consumed fresh, while over 90% of tart cherries are processed.

64. The products claim the approximate equivalent of 5 cherries based on the net weight of dried fruit.

65. Based on USDA data, a sweet raw cherry weighs 8.2 grams which means five of them are 41 grams prior to being dried.

66. Sour or tart cherries are generally smaller, and the most predominant cultivars weigh less than 6.0 grams.

67. The table below uses 41 grams for tart cherry because even though there is not an average defined size, it is probable the figure for sweet cherries is used by defendant because it enables consistency with the USDA framework for servings of fruit.

|            | Sweet Cherry | Tart Cherry | Tart Cherry |
|------------|--------------|-------------|-------------|
| Weight x 5 | 41 g         | 41 g        | 30 g        |
| Water      | 33.72        | 35.3133     | 25.839      |
| Solid      | 7.28         | 5.687       | 4.161       |
| Sugar      | 5.26         | 3.4809      | 2.547       |
| Calories   | 26           | 20.5        | 15          |
| Iron, mg   | .15          | .13         | .10         |

68. The product claims the presence of ½ of an apple which is ¼ cup serving for crediting purposes by the USDA.

69. One-half of an apple contains approximately 5.25 grams of sugar, yet the sugar contributed by 5 or so tart cherries is less than 3.5 grams, making the total 8.75 grams of sugar, out of 11 total grams of sugar.

70. The difference of the roughly 2.25 grams of sugar is made up in the dehydration process which the cherries undergo.

71. Like the process described for the tropical fruits, cherries are first cut on the surface, then "immersed" in a sucrose hypertonic solution or very often, concentrated fruit juice.

72. It is probable that the osmotic agent used for dehydration of the cherry ingredients is a concentrated fruit juice, sufficient to elevate the percentage of iron to 6% RDI or 1 milligram.

73. Because the product states iron is present in an amount of 1 mg, this means it contains above 0.95 mg and below 1.1 mg.

74. This is because ½ apple has only .06 mg iron, which together with the cherry ingredient, only would have at most .20 mg iron.

75. In addition to increasing the net sugar content of the cherries, the osmotic solution must elevate the iron content by at least 0.75 mg to allow the declaration of 1% RDI.

76. The Products misleadingly claim they do not contain added sugar because sugars and other ingredients that contain sugars that functionally substitute for added sugars are added during processing or packaging and it is plausible that the product contains an ingredient containing added sugars such as concentrated fruit juice, used in the processing of the cherry ingredients.

77. The Products contain misrepresentations related to the predominance of ingredients.

78. The Products do not indicate the presence of water in the ingredient list, which is misleading, among other misleading claims, some of which are directed to children.

79. Excluding tax, the Products cost no less than $3.99, a premium price compared to other similar products.

## Jurisdiction and Venue

80. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

81. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

82. This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

83. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

84. A substantial part of events and omissions giving rise to the claims occurred in this District.

## Class Allegations

85. The classes consist of all consumers in the following states: <u>all</u>, <u>New York</u> who purchased any Products with actionable representations during the statutes of limitation.

86. A class action is superior to other methods for fair and efficient adjudication of this

controversy.

87. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

88. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

89. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

90. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

91. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

92. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

93. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

94. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

## Parties

95. Plaintiff is a citizen of Queens County, New York.

96. Kind LLC is a Delaware limited liability company with its principal place of business in New York.

97. Kind Inc. is a Delaware corporation with its principal place of business in New York.

98. Kind Inc. is a citizen of Delaware and New York.

99. Kind LLC is a citizen of New York because its only member is Kind Inc.

100. Diversity jurisdiction exists because one plaintiff is diverse in citizenship from at least one defendant, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

101. In 2017, plaintiff purchased one or more of the Products for personal consumption, for no less than $3.99, excluding tax, at a store located within this district.

102. Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

### New York General Business Law ("GBL") §§ 349 & 350

103. Plaintiffs incorporates by references all preceding paragraphs.

104. Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

105. Plaintiff desired to purchase products which were comprised of fruit ingredients that maintained the nutritional content and value of the whole fruit form and did not contain added sugars and ascorbic acid and believed he/she did so based on the representations of defendant.

106. Defendant's representations are false, unfair, deceptive and misleading for the reasons described herein.

107. The representations and omissions were relied on by plaintiff and class members, who paid more than they would have otherwise, causing damages.

### Negligent Misrepresentation

108. Plaintiff incorporates by references all preceding paragraphs.

109. Defendant misrepresented the composition of the Products by using collective ingredient names, omitting ingredients and claiming things which are not true.

110. Defendant had a duty to disclose, in a manner prescribed by law, that its Products did/did not contain said ingredients.

111. At the time of the representations, defendant knew or should have known same were false or misleading.

112. Defendant negligently misrepresented and/or negligently omitted material facts.

113. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

114. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

Breach of Express Warranty and Implied Warranty of Merchantability

115. Plaintiff incorporates by references all preceding paragraphs.

116. Defendant manufactures and sells fruit products purporting to be the equivalent of the fruit but in a non-fresh form and promotes that the products do not contain added sugar.

117. Defendant warranted to plaintiff and class members that when this was not truthful and was misleading due to what it omitted, etc.

118. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

119. Plaintiff and class members relied on defendant's claims, paying more than they would have otherwise.

Fraud

120. Plaintiff incorporates by references all preceding paragraphs.

121. Defendant's purpose was to mislead consumers who seek foods which are as close to their original form as possible and contain ingredients they are familiar with and do not contain chemical-sounding terms like ascorbic acid.

122. Plaintiff and class members observed and relied on defendant's claims, causing them

to pay more than they would have otherwise, entitling them to damages.

### Unjust Enrichment

123. Plaintiff incorporates by references all preceding paragraphs.

124. Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of such inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant(s) to correct such practices to comply with the law;

3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;

4. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

5. Such other and further relief as the Court deems just and proper.

Dated:   September 4, 2018

                                                Respectfully submitted,

                                                Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
891 Northern Blvd., Suite 201
Great Neck, NY 11021
Tel: (516) 303-0552
spencer@spencersheehan.com

                Levin-Epstein & Associates, P.C.
                /s/Joshua Levin-Epstein
                Joshua Levin-Epstein
                1 Penn Plaza, Suite 2527
                New York, NY 10119
                Tel: (212) 792-0046
                joshua@levinepstein.com

1:18-cv-04982
United States District Court
Eastern District of New York

Cassandra Song individually and on behalf of all others similarly situated

              Plaintiffs

  - against -

Kind LLC, Kind INC.

              Defendant(s)

## Complaint

Sheehan & Associates, P.C.
891 Northern Blvd., #201
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: September 4, 2018

                        /s/ Spencer Sheehan
                        Spencer Sheehan